UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

98-14144
CIV-MOORE

NATIONAL AUDUBON SOCIETY,
a New York Not-For-Profit corporation,
registered to do business in Florida,

    Plaintiff,

v.

101 RANCH, INC., a Florida Corporation,
HAYNES WILLIAMS, TIGER CATTLE
COMPANY, MICHAEL POWELL, and
STEVE POWELL,

    Defendants.
_____/

CASE NO.:

MAGISTRATE JUDGE
LYNCH

### PLAINTIFF, NATIONAL AUDUBON SOCIETY'S COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

The National Audubon Society, by and through its undersigned attorneys, alleges as follows:

I. INTRODUCTION

1.    The National Audubon Society (NAS) brings this civil action to enjoin defendants, 101 Ranch, Inc., its principal agent Haynes Williams (collectively "101 Ranch"), the Tiger Cattle

1



Company, its owners Michael and Steve Powell (collectively "Tiger Cattle Company"), and Michael Powell from "taking an endangered species in violation of Section 9 of the Endangered Species Act, ("ESA" or "Act"), 16 U.S.C.§ 1538(a)(1)(b) (collectively "Defendants"). The Defendants' actions have altered the historic drainage patterns of water on the Ordway-Whitell Kissimmee Prairie Sanctuary ("Sanctuary") or have contributed to regional hydrologic patterns that have and/or will result in actual harm to the Florida grasshopper sparrow, a critically protected endangered species without federal authorization. A temporary restraining order, preliminary injunction, and permanent relief from this Court is necessary to prevent water levels on the Sanctuary and regional hydrology from harming this small endemic song bird as harm has been interpreted under the Act.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to 28 U.S.C.§ 1345 and 16 U.S.C. §1540(c). The NAS is authorized to enforce the Endangered Species Act and to seek injunctive relief pursuant to 16 U.S.C. §1540(g).

3. Venue is proper in the United States District Court for Southern District of Florida pursuant to 28 U.S.C.§ 1391(b) because Defendants reside in this district and/or the acts or omissions complained of occurred within this district.

## III. PARTIES

4. The Plaintiff, National Audubon Society, is a not for profit corporation licensed to conduct business in the State of Florida. Audubon owns and controls 7,315.5 acres of real property in Okeechobee County, Florida. Audubon operates this property, known as the Ordway-Whittell Kissimmee Prairie Sanctuary, as a nature preserve.

5. On information and belief, the Defendant, 101 Ranch, Inc., is a corporation organized

2

under the laws of the State of Florida. On information and belief, Haynes Williams is the registered agent for, and main principal of, 101 Ranch, Inc. 101 Ranch owns or controls approximately 3,014.6 acres of real property operated as an improved pasture cattle ranch located in Okeechobee County, Florida. The 101 Ranch lies directly adjacent to the Sanctuary's southern boundary.

6. On information and belief, the Defendant Tiger Cattle Company is a corporation organized under the laws of the State of Florida. On information and belief, Defendant Michael and Steve Powell own or control the Tiger Cattle Company and its real property located in Okeechobee County, Florida. The Tiger Cattle Company lies adjacent to the Sanctuary's southern and eastern boundaries.

7. On information and belief, Defendant, Michael Powell owns or controls real property located in Okeechobee County, Florida. This property lies adjacent to the Sanctuary's eastern boundary.

## IV. LEGAL AND FACTUAL BACKGROUND

A.  **The Endangered Species Act**

8. The Endangered Species Act, 16 U.S.C. §1531, et seq., was enacted in 1973 for the express purpose of providing a means of conserving the ecosystems of endangered and threatened species. 16 U.S.C. §1531(b).

9. The ESA defines an "endangered species" as any species which is in danger of extinction throughout all or a significant portion of its range. 16 U.S.C. § 1532(6).

10. The ESA authorizes the Secretary of the Interior or the Secretary of Commerce to "identify", or "list," any species as endangered if any one of five specific factors are met. 16 U.S.C. §1533(a)(1).

3

11.     Without a permit or other authorization, it is unlawful for any person to "take" a protected species. 16 U.S.C. §1538(a)(1)(B). Defendants are persons within the meaning of 16 U.S.C. §1532(13).

12.     The Act defines the term "take" to mean harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such activity. 16 U.S.C. §1532(19). Regulations promulgated by the United States Fish and Wildlife Service further define the term "harm" and "harass" as follows:

> Harm in the definition of "take" in the act means an act which actually kills or injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering. See, S. Rep. No. 307, 93d Cong., 1st Session ("Take" is to be "defined in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife").

****

> Harass in the definition of "take" in the Act means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering.

50 C.F.R. §17.3.

13.     The ESA's prohibition against takings applies to persons engaged in activities that are not intended or designed to take species listed under the Act, but that may do so incidentally. See, Palila v. Hawaii Department of Land & Natural Resources, 852 F.2d 1106 (9th Cir. 1988); Forest Conservation Council v. Rosboro Lumber Company, 50 F.3d 781 (9th Cir. 1995).

B.     The Grasshopper Sparrow

14.     The Florida sub-species of the grasshopper sparrow (*Ammodramus savannarum floridanus*) is a small, short-tailed song bird endemic to south-central Florida. In 1986, the United

4

States Fish and Wildlife Service listed the grasshopper sparrow as an endangered species. 51.Fed.Reg.27492-27495 (July 31, 1986). At the time of its listing, the primary threat to the grasshopper sparrow was the destruction of its habitat as a result of the conversion of native grassland to improved pasture. At present, only 300 pairs of grasshopper sparrows, distributed in six small, isolated populations, remain the entire State of Florida.

15. The grasshopper sparrow nest on the ground within the dry prairie vegetative community. Breeding season usually commences on March 1 and extends through the summer. The grasshopper sparrow builds nests in shallow depressions excavated in dry ground. Absent dry ground and the necessary vegetative cover, the Florida grasshopper sparrow will not successfully reproduce.

16. The grasshopper sparrow feeds primarily on insects and seeds within its breeding territory. Dry ground is a necessary prerequisite to provide sufficient available food supplies.

17. Florida grasshopper sparrows do not migrate and exhibit a high fidelity to established breeding territories.

18. The average adult Florida grasshopper sparrow lives three years. Average annual mortality for the Florida grasshopper sparrow is 40 percent.

19. One of the six remaining sub-populations of the Florida grasshopper sparrows resides on the Sanctuary.

20. The Sanctuary population of the grasshopper sparrow is genetically distinct from the five other populations. Genetically distinct populations indicate little, if any, migration of individuals between populations.

21. With a relatively short life-span, relatively high annual mortality, and no migration,

maintenance of the grasshopper sparrow population on the Sanctuary is dependent upon successful reproduction.

22.  In 1993, sixteen breeding pairs of the Florida grasshopper sparrow resided on study plots on the Sanctuary. In 1997, six pairs remained. As of April 15, 1998, only one pair of Florida grasshopper sparrows has been located on the Sanctuary. These study plots cover about ½ the available sparrow habitat on the Sanctuary.

23.  Since 1993, the Florida grasshopper sparrows on the Sanctuary have either failed to reproduce successfully or have reproduced at substantially lower levels than prior years. In 1996 and 1997, for example, the remaining breeding pairs of grasshopper sparrows on the Sanctuary study plots failed to reproduce.

24.  The failure of the Sanctuary's grasshopper sparrow population to successfully reproduce is a direct result of artificially high water levels on the Sanctuary that have occurred at the Sanctuary since 1993.

C.  The Sanctuary And The Historic Pattern of Water Drainage

25.  In 1980, NAS founded the Ordway-Whittell Kissimmee Prairie Sanctuary on 6,107 contiguous acres of land deeded to it by The Nature Conservancy. NAS created the Sanctuary to preserve a rare and unique ecological area of natural prairie from development.

26.  In 1983, Defendant 101 Ranch Inc. purchased land along the southern border of the Sanctuary in sections, 4, 5, and 6, Township 34 South, Range 34 East. A raised road known as Military Grade ran roughly east to west through this parcel.

27.  In 1984, NAS purchased from 101 Ranch, Inc. approximately 879.6 acres of land in Section 4, 5, and 6, Township 34 South, Range 34 East. The land NAS acquired from 101 Ranch,

Inc. lies to the north of Military Grade. As a result of this purchase, Military Grade then formed the new boundary between the Sanctuary and 101 Ranch.

28. As part of the land transaction described in paragraph 27 above, Audubon and 101 Ranch entered into two reciprocal agreements regarding the use of Military Grade and the use and drainage of water for the respective parties. Under the terms of these documents, Audubon agreed not to drain water onto 101 Ranch, 101 Ranch agreed not to draw water from the Sanctuary, and Audubon represented that it would obtain alternative drainage rights via the then-proposed "Carlton Drainage Canal."

29. Historically, water flowed onto the Sanctuary during the wet season from properties north and east and drained off Sanctuary property to properties to the west through Seven Mile Slough and properties to the south into Fish Slough. Fish Slough naturally meandered through land owned or controlled by 101 Ranch for tens of years.

30. In 1984 drainage facilities previously built into Military Grade permitted water to flow through the raised road and into Fish Slough. Th facilities included two 24-inch and one 36-inch culverts with no control structures. If these drainage works proved inadequate, water would flow over the grade as a final flood relief valve. Water passing through or over Military Grade flowed onto land owned or controlled by 101 Ranch and the Tiger Cattle Company.

31. Prior to 1993, sufficient water drained off the Sanctuary to provide hundreds of acres of dry habitat for the grasshopper sparrow population.

D.   Defendants' Alterations to Historic Drainage Patterns

32. In 1979, the Tiger Cattle Company built a dike on the north and west border of its property. This dike diverted water toward the Sanctuary that would otherwise flow past the

Sanctuary and onto land owned or controlled by the Tiger Cattle Company.

33. The South Florida Water Management District (SFWMD) regulates the use and control of water resources in much of South Florida, including Okeechobee County. In 1985, the SFWMD indicated that it would not approve the Carlton Drainage Canal which was the subject of the water agreements of paragraph 28 above.

34. In 1993, 101 Ranch fitted the two 24-inch culverts with flashboard risers and replaced the 36-inch culvert with an 18-inch culvert with flashboard risers which reduced the amount of water permitted to flow from the Sanctuary property through the Military Grade and onto 101 Ranch property.

35. In 1995, 101 Ranch raised the level of Military Grade in two relatively low locations (former low water crossings) to prohibit water from crossing over the roadway from Sanctuary property and onto 101 Ranch property. In that same year, Mike Powell also raised the level of Military Grade on his property to prevent water from flowing over Military Grade and southward over his property.

36. In July of 1996, NAS installed a 36 inch culvert in Military Grade that discharged water from the Sanctuary property onto 101 Ranch property restoring the historic hydrologic regime. Shortly thereafter, 101 Ranch subsequently removed, or rendered inoperable, the 36-inch culvert installed by NAS.

37. During 1997, 101 Ranch and NAS alternately added or removed riserboards to block or free historic water flow through the remaining 18-inch culvert in Military Grade; the culvert installed by 101 Ranch replacing the historic 36-inch culvert.

38. On December 25, 1997, 101 Ranch permanently blocked the 18-inch culvert by

filling it with concrete.

39. Florida state law and administrative regulations prohibit the alteration of drainage patterns in Okeechobee County without the prior approval of the South Florida Water Management District ("SFWMD").

40. NAS now has no permanent mechanism to drain water flowing onto its property off of the Sanctuary.

41. The actions of the Defendants and 101 Ranch Inc., Michael Powell, and Tiger Cattle Company significantly reduced and then eliminated drainage of offsite water coming onto the Sanctuary to historic receiving properties by severing any hydraulic connection, natural or man-made, to Fish Slough.

E. <u>The Effect On The Grasshopper Sparrows Of The Defendants' Alterations to Historic Drainage Patterns</u>

42. The removal of all historic hydrologic mechanisms through Military Grade and the absence of any viable alternative hydrologic method to restore historic Sanctuary hydrologic regimes have had a severe effect on the Sanctuary's grasshopper sparrow population by reducing and/or eliminating the species' breeding habitat.

43. The reduction in or absence of drainage on the Sanctuary has resulted in elevated water levels and saturated soils on the Sanctuary over the last several years.

44. The elevated water levels on the Sanctuary over the last several years inundated or saturated all or significant portions of grasshopper sparrow nesting habitat during the breeding season. As a result, the grasshopper sparrows on the Sanctuary have either completely failed to reproduce (as was the case in 1996 and 1997) or reproduced at significantly lower levels than in the

past.

45.  The absence or reduced recruitment of juveniles into the breeding population of the grasshopper sparrows on the Sanctuary since 1993, in combination with mortality of adults, has caused the identified number of breeding pairs on the Sanctuary to fall from sixteen to one in the last several years.

F.  <u>Current Water Levels On The Sanctuary And the Threat Of Extinction Of The Grasshopper Sparrow Population</u>

46.  Because of the lack of any drainage opportunities to Fish Slough, the water levels on the Sanctuary remain abnormally high.

47.  Historic breeding territories of the grasshopper sparrows on the Sanctuary have only recently been exposed to the air and groundwater levels remain high. As a result, while the territories do not currently contain surface waters, the soils remain saturated and unsuitable for nesting purposes.

48.  If the present water levels and soil saturation continue to exist on the Sanctuary and no provision for drainage occurs, rain events during the next few months will likely inundate the grasshopper sparrows' nesting habitat for extended periods of time. This pattern of repeated and extended inundation from rain events occurred in 1996 and 1997. If the pattern of innundation occurs again this year, the remaining grasshopper sparrows on the Sanctuary will not likely successfully reproduce.

49.  The average life span of a grasshopper sparrow is only 3 years. Little if any successful reproduction of grasshopper sparrows has occurred on the Sanctuary over the last 3 years. As a result, the Sanctuary population of the grasshopper sparrows may be extirpated absent

10

successful reproduction this year.

50. Loss of the Sanctuary population of the Florida grasshopper sparrow represents a significant decrease in that species' ability to avoid extinction.

G. Local Efforts To Resolve The Drainage Problem

51. Audubon, 101 Ranch, Michael Powell, Tiger Cattle Company, other local land owners, and the SFWMD have sought to resolve local drainage issues over the last two years, including how to dispose of water impounded on the Sanctuary. The parties engaged the services of a professional hydrologist to assess drainage options.

52. Preservation of the status quo effectively turns the Sanctuary into a flood control reservoir for the benefit of downstream land owners. These parties, therefore, possess little incentive to timely and expeditiously agree to resolve the problem of water inundation on the Sanctuary to enhance nesting opportunities.

53. Presence of the status quo sends Fish Slough water into Seven Mile Slough, damaging those properties and flooding ecologically sensitive grasshopper sparrow habitat on the Kissimmee Prairie State Preserve.

54. In late February and early March 1998, the U.S. Fish and Wildlife Service notified 101 Ranch, Mike Powell, and Tiger Cattle Company, that their actions have and will continue to result in harm to the Florida grasshopper sparrow by significantly interfering with its essential breeding behaviors and would therefore violate the ESA.

55. On August 13, 1996, the U.S. Fish and Wildlife Service wrote a letter to the SFWMD noting the serious nature of the impounding problem and encouraging them to expedite a solution.

11

56. In early March, 1998, the U.S. Fish and Wildlife Service made a formal presentation to the SFWMD about the need for immediate action to prevent harm to grasshopper sparrow.

57. On April 1, 1998, the SFWMD issued two Emergency Orders. In these Emergency Orders, the SFWMD recognizes that the Sanctuary is inundated with water, that the current water levels will prevent successful grasshopper sparrow reproduction this year, and that the need exists for action to lower the water levels on the Sanctuary.

58. In the first Emergency Order, the SFWMD directed NAS to develop by April 10, 1998, a set of engineering plans to install culverts through Military Grade. However, NAS may only commence installation of these culverts upon approval of the SFWMD of the engineering plans and the completion of the downstream improvements that are the subject of the SFWMD's second Emergency Order.

59. In the second Emergency Order, the SFWMD directed several downstream landowners to submit for approval by May 1, 1998, engineering plans to construct a Fish Slough bypass channel and other improvements to carry downstream water drained off of the Sanctuary. The downstream parties must complete the drainage channel and other improvements within ten (10) days of the SFWMD's approval of the proposed plans.

60. On April 10, 1998, NAS delivered to the SFWMD engineering plans to install two 24 by 35 inch pipe arch culverts through Military Grade. The hydrologist submitting the plans calculated that these two culverts would provide drainage capacity sufficient to handle a three-day, 10-year storm event for the three square mile subbasin immediately north of Military Grade.

61. After NAS submitted the engineering plans for culvert installation to the SFWMD, 101 Ranch and several other downstream landowners filed petitions for formal

administrative hearings with the SFWMD challenging the Emergency Orders ("Petitions"). Under applicable state law and Chapter 120, Florida Statutes, these Petitions stayed the effectiveness of the SFWMD's Emergency Orders.

62. On April 16, 1998, the Governing Board for the SFWMD met and discussed whether to take affirmative action to enforce the April 1, 1998 Emergency Orders in order to provide some measure of hydrologic relief to the Sanctuary and the habitat of the grasshopper sparrows.

63. During the April 16th meeting, NAS expressed concern that the Emergency Orders would not provide requisite hydrologic relief because: 1) the Fish Slough bypass described in paragraph 59 above was interminably delayed by the Petitions for which trial would not be held until October, 1998, 2) the culverts in the Military Grade are designed only to drain a 3 square mile area, but an 11.5 square mile area is actually impounded or affected by Defendants.

64. During the April 16th meeting, the SFWMD Governing Board declined to take any affirmative act to ratify the Emergency Orders or otherwise to seek enforcement of the corrective measures contemplated by the Emergency Orders. Instead, the SFWMD Governing Board directed SFWMD staff to continue to facilitate discussions with all affected parties in order to reach a consensus solution and to present a status report to the Governing Board on May 14, 1998.

H. <u>Measures Necessary To Save The Grasshopper Sparrows</u>

65. In order to ensure adequate dry breeding habitat necessary to not interfere with the grasshopper sparrow's normal breeding patterns this year, sufficient water must be immediately drained off the Sanctuary and drainage facilities installed so that the grounds dry out and any future rain events will not result in returning inundation.

66. The measures described in the SFWMD's April 1, 1998 Emergency Order directing

13

the installation of culverts into Military Grade will not provide the sufficient drainage capacity to lower the water levels resulting in dry ground and for nesting purposes to ensure that future rain events will not likely reinundate the grasshopper sparrow's nesting habitat on the Sanctuary because of hyrologic design defects.

67. In order to provide meaningful benefit to, and avoid the likelihood of harming the grasshopper sparrow, culverts through the Military Grade must be installed immediately that will adequately drain the entire 11.5 square mile impounded area as described by Lennart Lendahl's, P.E., original plan that included culverts in the Carlton Drainage Easement.

### III. CLAIM FOR RELIEF

68. The allegations of paragraph 1 through 67 are realleged and incorporated herein by reference.

69. The Florida grasshopper sparrow is classified as an endangered species under the ESA.

70. Section 9(a)(1)(B), 16 U.S.C. 1538(a)(1)(B), of the ESA prohibits persons from taking endangered species.

71. 101 Ranch Inc., Haynes Williams, Tiger Cattle Company, Mike Powell and Steve Powell are "persons" within the meaning of the ESA and are therefore subject to the take prohibition of Section 9(a)(1)(B) of the ESA.

72. 101 Ranch Inc., Tiger Cattle Company, and Mike Powell's actions of concentrating water on, and/or preventing the drainage of water off the Sanctuary have resulted and will continue to result in actual harm to, and therefore a take of, Florida grasshopper sparrows by significantly modifying and degrading the species' habitat in violation of Section 9(a)(1)(B) of the

ESA.

73. The artificially high water levels as a result of Defendants' actions or inactions will actually injure the Florida grasshopper sparrows by significantly impairing, if not preventing, the species' essential breeding behaviors. As example, rising water levels may either cause the sparrow eggs to not hatch, or if the eggs hatch, the nestlings may drown. Also, the high water severely restricts available food supply increasing the mortality of the nestlings.

## IV. REQUESTED RELIEF

WHEREFORE, Plaintiff, National Audubon Society, respectfully requests:

1. That a temporary restraining order, and a preliminary and permanent injunction issue to enjoin the Defendants, individually and collectively, from actions or inactions that maintain water on the Sanctuary at levels that inundate, adversely effect, or saturate the breeding habitat of the Florida grasshopper sparrow;

2. That a temporary restraining order, preliminary injunction, and permanent injunction issue to enjoin the Defendants, individually and collectively, to restore the historic hydraulic connection between the Sanctuary and Fish Slough by immediately installing drainage facilities through Military Grade establishing adequate ecological protection of the habitat for the Florida grasshopper sparrows on the Sanctuary or cause other hydrologic corrective measures to occur which are acceptable to ornithological experts as protective of grasshopper Sparrow habitat;

3. That National Audubon Society be awarded its costs of this legal proceeding, including attorneys' and expert witness' fees; and

4. Any further or necessary relief that the Court determines just and proper in the circumstances.

Respectfully submitted,

*[signature]*

Thomas J. Baird, Esquire
THOMAS J. BAIRD, P.A.
11891 U.S. Highway One, Suite 201
North Palm Beach, FL 33408
Telephone: (561) 691-1766
Florida Bar No. 475114


J. A. Jurgens, Esquire
J. A. JURGENS, P.A.
505 Wekiva Springs Road, Suite 800
Longwood, FL 32779
Telephone: (407) 772-2277
Facsimile: (407) 772-2278
Florida Bar No. 637165

F:\MISC\Audubon.com.wpd